UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

REPORT AND RECOMMENDATION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Wayne Zych, Michael Currence,
Whempner Brothers, Sisseton
Livestock, Inc., Carson Larson,
Marion Blom, Gregory A. Jensen,
Fredin Brothers, Inc., Keith
Kvistero, and Roger Stotts,

                            Plaintiffs,

    vs.

National Beef Packing Company,
L.L.C.,

                            Defendants.          Civ. No. 07-1963 (JMR/RLE)

        \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

I. Introduction

    This matter came before the undersigned United States Magistrate Judge

pursuant to a special assignment, made in accordance with the provisions of Title 28

U.S.C. §636(b)(1)(B), upon the Motion of the Defendant National Beef Packing

Company, L.L.C. ("National Beef"), for Summary Judgment. A Hearing on the

Motion was conducted on September 24, 2009, at which time, the Plaintiffs appeared

by David C. McLaughlin, Esq., and National Beef appeared by Louis A. Huber, III, Esq.  For reasons which follow, we recommend that National Beef's Motion for Summary Judgment be granted as to the Plaintiffs' claims of apparent agency, but denied as to the Plaintiffs' claims of actual agency.

## II.  Factual and Procedural Background

In this action, the Plaintiffs sold cattle to Nicollet Cattle Trading Company ("Nicollet")[1] which, the Plaintiffs allege, was the agent of National Beef.  According to the Plaintiffs, they sold their cattle to Nicollet, as National Beef's agent, but Nicollet's checks, in payment for that cattle, were returned for insufficient funds. While National Beef appears to have transmitted checks to Nicollet, in payment for the Plaintiffs' cattle, the checks were deposited in an account that Nicollet maintained with Wachovia Capital Finance Corporation ("Wachovia"), as collateral for a line of credit that Wachovia had extended to Nicollet.  The checks from National Beef went to the benefit of Wachovia, leaving Nicollet with insufficient funds to honor its checks

---

[1]Nicollet was a Division of GFI America, Inc. ("GFI"), which was a corporation organized under the laws of Minnesota.  Gary Goldberger ("Goldberger") was a Vice President with GFI, and was the President of Nicollet, and he functioned as Nicollet's principal cattle buyer.  While some of the Plaintiff's allegations identify Goldberger, or GFI, we follow the parties' lead in treating GFI, Goldberger, and Nicollet, as being synonymous, and therefore, interchangeable.

to the Plaintiffs.  Given this arrangement, the Plaintiffs argue that, because they were not paid for their cattle, and because National Beef had the benefit of their cattle, National Beef owes them the purchase price of the cattle, since Nicollet was the agent of National Beef.

National Beef argues, however, that Nicollet was independent of National Beef, and therefore, that Nicollet's acts cannot be imputed to National Beef.  National Beef now seeks a Summary Judgment that Nicollet was neither National Beef's apparent agent, nor its actual agent.  With that brief background, we analyze the parties' conflicting contentions and, to the extent that additional facts may assist in our analysis, we detail those in our Discussion section.

## III.  Discussion

A.      Standard of Review.  Summary Judgment is not an acceptable means of resolving triable issues, nor is it a disfavored procedural shortcut when there are no issues which require the unique proficiencies of a Jury in weighing the evidence, and in rendering credibility determinations.  See, Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986); Midwest Oilseeds, Inc. v. Limagrain Genetics Corp., 387 F.3d 705, 711 (8th Cir. 2004), cert. denied, 544 U.S. 977 (2005).  Summary Judgment is appropriate when we have viewed the facts, and the inferences drawn from those facts, in a light

most favorable to the nonmoving party, and we have found no triable issue. See, <u>Eide v. Grey Fox Technical Servs. Corp.</u>, 329 F.3d 600, 604 (8th Cir. 2003); <u>Philip v. Ford Motor Co.</u>, 328 F.3d 1020, 1023 (8th Cir. 2003); <u>United Fire & Casualty Co. v. Garvey</u>, 328 F.3d 411, 413 (8th Cir. 2003).

For these purposes, a disputed fact is "material" if it must inevitably be resolved and the resolution will determine the outcome of the case, while a dispute is "genuine" if the evidence is such that a reasonable Jury could return a Verdict for the nonmoving party. See, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Planned Parenthood of Minnesota/ South Dakota v. Rounds</u>, 372 F.3d 969, 972 (8th Cir. 2004); <u>Fenney v. Dakota, Minnesota & Eastern R.R. Co.</u>, 327 F.3d 707, 711 (8th Cir. 2003).

As Rule 56(e)(2) makes clear, once the moving party files a properly supported Motion, the burden shifts to the nonmoving party to demonstrate the existence of a genuine dispute. In sustaining that burden, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must -- by affidavits or as otherwise provided in this rule -- set out specific facts showing a genuine issue for trial." <u>Rule 56(e)(2), Federal Rules of Civil Procedure</u>; see also, <u>Anderson v. Liberty Lobby, Inc.</u>, supra at 256; <u>Eddings v. City of Hot Springs, Ark.</u>, 323 F.3d 596, 602 (8th Cir. 2003).

Moreover, the movant is entitled to Summary Judgment where the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, supra at 322; see also, Forest Park II v. Hadley, 408 F.3d 1052, 1057 (8th Cir. 2005); Mercer v. City of Cedar Rapids, 308 F.3d 840, 843 (8th Cir. 2002); Hammond v. Northland Counseling Center, Inc., 218 F.3d 886, 891 (8th Cir. 2000). No genuine issue of fact exists in such a case because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, supra at 323; see also, Sallis v. University of Minnesota, 408 F.3d 470, 474 (8th Cir. 2005); Davis v. U.S. Bancorp, 383 F.3d 761, 768 (8th Cir. 2004); Bell Lumber and Pole Co. v. United States Fire Ins. Co., 60 F.3d 437, 441 (8th Cir. 1995).

B.    <u>Legal Analysis</u>.  National Beef contends that, under the applicable laws

of Minnesota,[2] it is entitled to Summary Judgment on the Plaintiffs' claims which are

predicated upon either apparent or actual authority.  We agree in part.

1.    <u>Standard of Review</u>.  As explained by the Minnesota Supreme

Court, in  <u>A. Gay Jenson Farms Co. v. Cargill, Inc.</u>, 309 N.W.2d 285, 290 (Minn.

1981):

> Agency is the fiduciary relationship that results from the
> manifestation of consent by one person to another that the
> other shall act on his behalf and subject to his control, and
> consent by the other so to act.  Jurek v. Thompson, 308
> Minn. 191, 241 N.W.2d 788 (1976); Lee v. Peoples
> Cooperative Sales Agency, 201 Minn. 266, 276 N.W. 214
> (1937); Restatement (Second) of Agency §1 (1958).  In
> order to create an agency there must be an agreement, but
> not necessarily a contract between the parties.  Restatement
> (Second) of Agency §1, comment b (1958).  An agreement
> may result in the creation of an agency relationship al-
> though the parties did not call it an agency and did not
> intend the legal consequences of the relation to follow.  Id.
> The existence of the agency may be proved by circumstan-
> tial evidence which shows a course of dealing between the
> two parties.  Rausch v. Aronson, 211 Minn. 272, 1 N.W.2d

---

[2]We follow the parties' lead in applying Minnesota law in this diversity action.
See, <u>Hope v. Klabal</u>, 457 F.3d 784, 790 (8th Cir. 2006)("Minnesota law applies in this
diversity case," and "[w]e are bound by decisions of the Minnesota Supreme Court,
and if that court has not considered an issue, we must follow decisions of the
Minnesota Court of Appeals if they are the best evidence of Minnesota law."), citing
<u>Bockelman v. MCI Worldcom, Inc.</u>, 403 F.3d 528, 531 (8th Cir. 2005).

371 (1941).  When an agency relationship is to be proven
by circumstantial evidence, the principal must be shown to
have consented to the agency since one cannot be the agent
of another except by the consent of the latter.  Larkin v.
McCabe, 211 Minn. 11, 299 N.W. 649 (1941).

See also, Vacura v. Harr's Equipment, Inc., 364 N.W.2d 387, 391 (Minn. 1985)("We have frequently held that the existence of an agency relationship is a question of fact," and "have held that the existence of an agency relationship may be proved by circumstantial evidence of a course of dealing between the two parties.")[citations omitted]; Minnesota Forest Products, Inc. v. Ligna Machinery, Inc., 17 F. Supp.2d 892, 913 (D. Minn. 1998), quoting Church of the Nativity of Our Lord v. WatPro, 491 N.W.2d 1, 5-6 (Minn. 1992), quoting, in turn, Restatement (Second) of Agency §1 (1958).

"The three elements of an agency relationship are:  (1) consent to the agency; (2) action by the agent on behalf of the principal; and (3) exercise of control by the principal over the agent."  In the Matter of the Insurance Agents' Licenses of Kane, 473 N.W.2d 869, 873 (Minn.App. 1991), rev. denied (Minn., September 25, 1991), citing A. Gay Jenson Farms Co. v. Cargill, Inc., supra at 290-91.

"The Minnesota Court of Appeals summarized the law of apparent authority as follows:

A principal is bound not only by an agent's actual authority
but also by authority that the principal has apparently
delegated to the agent.  Apparent authority is authority a
principal "holds an agent out as possessing, or knowingly
permits an agent to assume."  To find apparent authority,
(1) "the principal must have held the agent out as having
authority, or must have  knowingly permitted the agent to

act on its behalf," (2) third parties "must have had actual knowledge that the agent was held out by the principal as having such authority or had been permitted by the principal to act on its behalf," and (3) "proof of the agent's apparent authority must be found in the conduct of the principal, not the agent."

Liimatta v. V & H Truck, Inc., 2005 WL 2105497 at *3-4 (D. Minn., August 30, 2005), quoting Powell v. MVE Holdings, Inc., 626 N.W.2d 451, 457 (Minn.App. 2001)[citations omitted].

"While apparent authority is usually based on some affirmative action on the part of the principal, authority may be found when the agent has regularly exercised some power not expressly given to it and the principal, knowing of the practice, tacitly sanctions its continuance." Vacura v. Haar's Equipment, Inc., supra at 391, citing Ziegler v. Denver Hog Serum Co., 204 Minn. 156, 283 N.W. 134 (1938); Dobbs v. Zink, 290 Pa. 243, 138 Atl. 758 (1927).

"Although the existence of an agency relationship is ultimately a legal determination, it is necessarily dependent upon the factual arrangement between the parties." In the Matter of the Insurance Agents' Licenses of Kane, supra at 873, citing PMH Properties v. Nichols, 263 N.W.2d 799, 802-03 (Minn. 1978). As a consequence, "[t]he existence of an agency relationship in particular, and a fiduciary relationship in general, are generally questions of fact." Papol v. Midas Resources, Inc., 2006 WL 1976035 at *5 (D. Minn., July 12, 2006); see also, Minnesota Forest

<u>Products, Inc. v. Ligna Machinery, Inc.</u>, supra at 914 ("Whether a party is an agent is a question of fact for the jury."), citing <u>Jurek v. Thompson</u>, 308 Minn. 191, 196, 241 N.W.2d 788, 791 (1976).

2.    <u>Legal Analysis</u>.  Since they involve somewhat different questions, we separately address National Beef's contention, first, that Nicollet was not its apparent agent and, second, that Nicollet was not its actual agent.  In its briefing on the question, National Beef concentrated on the absence of any evidence that demonstrated that Nicollet was its apparent agent, and we first address that issue.

a.    <u>Apparent Agency</u>.  At the time of the Hearing, counsel for the Plaintiffs conceded that they have no evidence of an apparent agency, between Nicollet and National Beef, except as to the Plaintiffs Marion Blom ("Blom"), and Gregory A. Jensen ("Jensen").[3]  Accordingly, without further discussion, we recommend that Summary Judgment be granted to National Beef, as to each of the Plaintiffs, with the exception of Blom and Jensen, insofar as the Plaintiffs have alleged

---

[3]In fact, in their Response to National Beef's Motion, the Plaintiffs do not even address the question of apparent authority, but instead, concentrate the full brunt of their opposition to Summary Judgment on the issue of an actual agency relationship between Nicollet and National Beef.  See, <u>Plaintiffs' Response, Docket No. 160</u>.  Our independent review has failed to uncover evidence that National Beef expressly held Nicollet out as its agent, at least as a general proposition, and therefore, we follow the Plaintiffs' lead in focusing upon the claims of Blom and Jensen.

an apparent agency between Nicollet and National Beef, and we proceed to address the individualized claims of Blom and Jensen concerning the existence of an apparent agency between Nicollet and National Beef.

In urging that some evidence supports the claims of Blom and Jensen, that Nicollet was the apparent agent of National Beef, counsel for the Plaintiffs specifically referred to Blom's deposition testimony, and an Affidavit of Dan Mercer ("Mercer"), who is an employee of Consolidated Beef Producers ("CBP") which, the Plaintiffs assert, made sales to Nicollet of Blom's and Jensen's interest in cattle which ultimately were obtained, by Nicollet, for National Beef. As to the testimony of Blom, and Jensen, we are not persuaded that they held information which would support an apparent agency claim against National Beef.

During the course of Blom's deposition, the following exchange occurred:

> Q: And I think I probably asked you this question, but you have already -- At the time of the transaction, did you have any understanding as to whether Nicollet or Gary Goldberger was or were agents of National Beef?

> A: I didn't know who they were before this.

> Q: You did not know who they were.

> A. No. I didn't know who they were. No.

Q.     Before the transaction, you did not know who --

A.     No.  I don't know who them people are.

Q.     -- who Gary Goldberger and Nicollet were.

A.     No, I don't know.

Q.     So you had no belief that they were agents of National Beef.

A.     Correct.

Q.     Okay.

A.     I didn't know.

Q.     You had no reason to believe.

A.     No.

Q.     You didn't know who they were.

A.     No.

Deposition of Blom, Docket No. 141-1, at p. 2 of 2.

Given this testimony, even construing its import in Blom's favor, we are unable to find a genuine issue of material fact, since Blom makes plain that he did not know who Goldberger, and Nicollet, were at the time of the cattle sales in question.

The same may be said with respect to Jensen's testimony.  During the course of his deposition, Jensen testified as follows:

- 11 -

Q.    Okay. At the -- Before April of 2005, what was your understanding of any relationship as you allege between National Beef and GFI [Nicollet]?

A.    Well, prior to April, I had never heard of National or -- excuse me -- GFI [Nicollet].

Q.    Okay. So before April of 2005, you had -- you did not believe there was any relationship between them.

A.    I never heard of them, so I guess I had no knowledge of that.

Deposition of Jensen, Docket No. 141-5, at p. 3 of 3.

Jensen went on to testify that he later understood that some kind of relationship existed, between National Beef and Nicollet, but he obtained that information from his attorney. Id. Accordingly, in this respect, Jensen's testimony is not meaningfully distinct from Blom's, as neither personally knew that Nicollet, or Goldberger, was acting as an agent of National Beef, until after the transactions which led to the cancellation of Nicollet's checks.

As we have noted, Minnesota Courts have consistently required that "the party dealing with the agent must have actual knowledge that the agent was held out by the principal as having such authority [to act on the principal's behalf] or had been permitted by the principal to act on its behalf; and the proof of the agent's apparent authority must be found in the conduct of the principal, not the agent." Foley v.

<u>Allard</u>, 427 N.W.2d 647, 652 (Minn. 1988), quoting <u>Hockemeyer v. Pooler</u>, 268 Minn. 551, 562, 130 N.W.2d 367, 375 (1964); <u>North Star Mutual Ins. Co. v. Zurich Insurance Co.</u>, 269 F. Supp.2d 1140, 1152 (D. Minn. 2003); <u>The Meyers Printing Companies, Inc. v. Desa, LLC</u>, 2007 WL 2907996 at *7 (D. Minn., October 2, 2007). Plainly, neither Blom, nor Jensen, had "actual knowledge" that National Beef had allowed Nicollet to act on its behalf, or held Goldberger out as its agent. Accordingly, the testimony of Blom, and Jensen, is unavailing, as an attempt to create a material issue of fact on the apparent agency question, but the Plaintiffs urge another approach to create a genuine issue of material fact, and base that approach on the deposition testimony, and Affidavit, of Mercer.

As noted, the Plaintiffs contend that CBP was acting as the selling agent for Blom and Jensen, and effected the sales of beef to Nicollet, which resulted in dishonored checks having been received from Nicollet, by Blom and Jensen. The contention further goes that Mercer, on behalf of CBP -- and as the agent of Blom and Jensen -- had been informed by the assistant head buyer of National, that Goldberger/ Nicollet was National's contact for the purchase of beef on behalf of National. We have attempted to trace this labyrinthine contention, through a tortuous path of snippets from various depositions, and from relevant business transactions, and find

that the Plaintiffs' effort to identify a valid material issue of fact fails on two (2) different grounds.

First, we agree with National Beef that, through the submission of Mercer's Affidavit, the Plaintiffs impermissibly seek to alter his prior deposition testimony so as to generate a genuine issue of material fact. See, e.g., City of St. Joseph, Mo. v. Southwestern Bell Telephone, 439 F.3d 468, 475-76 (8th Cir. 2006)("No party should be allowed to create 'issues of credibility' by contradicting his own previous testimony."), quoting Camfield Tires, Inc. v. Michelin Tire Corp., 719 F.2d 1361, 1366 (8th Cir. 1983); Roberts v. Park Nicollet Health Services, 528 F.3d 1123, 1126 (8th Cir. 2008)("In Camfield, we held that the plaintiff did not create a genuine issue of material fact simply by submitting an affidavit that contradicted testimony at a prior deposition, where there were not 'legitimate reasons' for filing an inconsistent affidavit."), quoting Camfield Tires, Inc. v. Michelin Tire Corp., supra at 1365. While Mercer's testimony is plainly not a model of clarity, we find that it does not create the void which the Plaintiffs attempt to fill with his subsequent Affidavit.

During the course of his deposition, Mercer testified that he spoke with Denny McDougall ("McDougall"), who was National's assistant head buyer, and learned that National had a contact in the area where CBP was interested in selling cattle, but

Mercer could not specifically recall that the name of Goldberger, or Nicollet, was mentioned.  See, <u>Deposition of Mercer, Docket No. 161-6</u>, at p. 3 of 10.  Later in the deposition, the questioning became more pointed:

> Q.    Was there more than one telephone conversation with Denny McDougall concerning selling cattle through Nicollet or Mr. Goldberger?
>
> *    *    *
>
> A.    You know, the main thing was it was pretty much a given in this industry, and that part of the country knew that Nicollet carried the order for National and for Creekstone, and to be able to get a bid for those two packers in that region, that was the representative to go to.
>
> *    *    *
>
> Q.    Well, did Mr. McDougall **ever** tell you that if you, Consolidated Beef Producers wanted to market cattle, they had to sell them through Nicollet if they went to National Beef?
>
> A.    In that particular region, did he say you have to if you are going to sell them to us?  No.  They had buyers in Omaha and in -- I don't even know where that other one was.  But to get a bid representing National, that was the person you had to use, yes.  But did he say if you want a National bid, you have to talk to Gary, no.

Q.      I guess I'm confused, what's the difference? Whether you could sell them to National or give them --

A.      What was your question?

Q.      My question was --

A.      Did Denny tell me?

Q.      Yeah.

A.      And I said no.

*      *      *

A.      Your question was did Denny tell me I had to sell -- call Nicollet to sell National cattle. That was your question.

Q.      Okay. And the answer to that was what?

A.      The answer to that was no.

Q.      Okay. So no one from National Beef represented to you that Consolidated Beef had to market its cattle through Nicollet to get to National Beef?

A.      Did they tell me that? No, they didn't tell me that.

Id. at p. 3 of 10 to p. 4 of 10 [emphasis in original].

Notwithstanding the foregoing testimony, in his Affidavit, which followed his deposition testimony by about four (4) months, Mercer attests to the following:

- 16 -

3.     In 2004 and 2005, I had several conversations with Denny McDougal [sic], the Assistant Cattle Buyer for National Beef.  In some of those conversations, the issue of selling cattle to National Beef in the Eastern Nebraska and South Dakota region came up.  Although I do not remember in which specific conversation it occurred, Denny McDougal [sic] did represent to me that the man they had in the region in which we could sell to National Beef through, was Gary Goldberger with Nicollet.

4.     I understand that I testified in my deposition that Gary Goldberger's name or Nicollet did not come up in the one conversation I was asked about by counsel.  During that one conversation that counsel asked me about in my deposition, as I stated in my deposition, I do not recall whether or not Gary Goldberger's name or Nicollet came up in that conversation regarding the man National Beef had upon in that region.  However, I do know that whether it was in that conversation or other conversations, Denny McDougal [sic] did indeed represent to me to go through Gary Goldberger and Nicollet as the avenue for CBP to sell cattle to National Beef in northeastern Nebraska, southeast South Dakota, Minnesota, and northwest Iowa.  Gary Goldberger and Nicollet was the only agent of National Beef CBP could get to bid for cattle in the eastern South Dakota area.  This is the area where Mr. Pravecek's operation is located in Scotland, South Dakota.

Affidavit of Mercer, Docket No. 161-8, at p. 1 of 2 to p. 2 of 2.

We find the Plaintiffs' effort to undermine Mercer's deposition testimony, by his subsequent Affidavit, is legally ineffectual.  As the extended quotation from Mercer's deposition plainly reflects, the questions put to him were not limited to one of many

- 17 -

conversations that Mercer assertedly had with McDougall.  Rather, the questions were

general in their import -- did McDougall **ever** tell Mercer that Goldberger, or Nicollet,

was the only avenue for the sale of cattle to National Beef -- and Mercer's response

was an unequivocal no.

As our Court of Appeals has reiterated:

> [I]f testimony under oath * * * can be abandoned many
> months later by the filing of an affidavit, probably no cases
> would be appropriate for summary judgment.  A party
> should not be allowed to create issues of credibility by
> contradicting his own earlier testimony.

Popoalii v. Correctional Medical Services, 512 F.3d 488, 498 (8th Cir. 2008), quoting
Camfield Tires, Inc. v. Michelin Tire Corp., supra at 1365; Herring v. Canada Life
Assurance Co., 207 F.3d 1026, 1030 (8th Cir. 2000), quoting Camfield Tires, Inc. v.
Michelin Tire Corp., supra at 1365.

Here, we confront no suggestion, from Mercer's Affidavit, that his deposition

testimony was the consequence of confusion -- and we find no such confusion -- or

that his earlier testimony needed clarification in any particular, as what he now offers

is directly contradictory of what he earlier stated under oath.  See, City of St. Joseph

v. Southwestern Bell Telephone, supra at 476.  Nor can we say that his later averments

did "not actually contradict his earlier testimony," as his subsequent averments cannot

be reasonably reconciled with the import of his earlier deposition responses.  Id.,

citing Bass v. City of Sioux Falls, 232 F.3d 615, 618 (8th Cir. 1999).  As a conse-

quence, after carefully examining the question, we conclude that the Plaintiffs' "sudden and unexplained revision of [Mercer's] testimony create[d] an issue of fact where none existed before."  Id., quoting Wilson v. Westinghouse Elec. Corp., 838 F.2d 286, 288 (8th Cir. 1988).

Even if we concluded that the Plaintiffs should be allowed to reform Mercer's earlier testimony, their contention, that Mercer's reputed conversations with McDougall sustain the Plaintiffs' apparent agency claims, suffers from an entirely different, and fatal deficiency.  We have been unable to isolate any evidence, in the Record presented, which cogently establishes that Mercer, or CBP, was the selling agent of Blom and Jensen.  We are quick to add that our task was all the more difficult because the pertinent excerpts, that the parties' have proffered, were largely drawn from depositions in an analogous case, which was venued in the District of South Dakota, and which related to the attempts of Francis Pravecek ("Pravecek") to obtain payment, from National Beef, after Nicollet's checks "bounced," for cattle that Pravecek had assertedly sold, through Nicollet, to National Beef.  See, Francis Pravecek v. Consolidated Beef Producers, Inc., and Billy Labrier v. National Beef Packing Co., Inc., LLC, and Creekstone Farms Premium Beef, LLC, Civ. No. 05-4147 (D. S.D.).  While the claims in Pravecek, and those presented here, are sometimes

overlapping, the testimony drawn from the <u>Pravecek</u> case is generally unavailing as to the parties' conflicting contentions on the issue of apparent authority.

We do not exclude the possibility that, somewhere in the voluminous materials that the parties have submitted, an oblique reference to an agency relationship, between Blom, Jensen, and CBP, is disclosed, but we have expended significant time in isolating any such evidence, and have been unsuccessful.[4]  In doing so, we believe that we have gone much further than the applicable law requires.  Under Rule 56(e), Federal Rules of Civil Procedure, "[i]n resisting a properly supported motion for summary judgment, the plaintiff has an affirmative burden to designate specific facts creating a triable controversy."  <u>Midwest Oilseeds, Inc. v. Limagrain Genetics Corp.</u>, 387 F.3d 705, 714 (8th Cir. 2004), cert. denied, 544 U.S. 977 (2005), quoting <u>Crossley v. Georgia-Pacific Corp.</u>, 355 F.3d 1112, 1113 (8th Cir. 2004)[internal quotation and

---

[4]We note, for example, that Billy Labrier ("Labrier"), who was another sales representative of CBP, testified to knowing that the checks, which Jensen, and "Case Blom," had received from Nicollet bounced, but the relationship between CBP, and Jensen, or "Case Blom," is not disclosed, nor are we able to say, on this Record, that "Case Blom" is the same "Blom" who is a Defendant in this matter.  See, <u>Deposition of Labrier, Docket No. 161-2</u>, at p. 2 of 4.

citation omitted].  Here, the Plaintiffs have not identified the specific evidence which supports their assertion, that CBP was the selling agent of Blom and Jensen.[5]

"A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." Gilbert v. Des Moines Area Community College, 495 F.3d 906, 915 (8th Cir. 2007), quoting White v. McDonnell Douglas Corp., 904 F.2d 456, 458 (8th Cir. 1990)[quotation omitted].  Nor should the Court be required to "mine a summary judgment record searching for nuggets of factual disputes to gild a party's arguments."  Id., quoting Rodgers v. City of Des Moines, 435 F.3d 904, 908 (8th Cir. 2006).  In short, "[s]imply providing a massive record does not satisfy this burden [under Rule 56(e)(2)], and we will not sort through a voluminous record in an effort to find support for the plaintiff's allegations."  Howard v. Columbia Public School District, 363 F.3d 797, 800-01 (8th

---

[5]In the Plaintiffs' Brief in Opposition, the only reference we have found to such an agency relationship simply states, without attribution to any of the materials submitted to the Court, that "[s]ome [of the Plaintiffs] sold the cattle through Consolidated Beef Producers, Inc., a Texas Cooperative that markets cattle for its members.  (Blom and Jenson [sic])."  Docket No. 160, at p. 6 of 23.  A citation to any evidence of Record, or a fresh Affidavit from an Affiant with direct personal knowledge, would have cured the Plaintiffs' omission.

Cir. 2004), cert. denied, 543 U.S. 956 (2004), citing Crossley v. Georgia-Pacific Corp., supra at 1113-14.[6]

Accordingly, finding no genuine issues of material fact concerning the Plaintiffs' apparent agency claims, we recommend that Summary Judgment be granted to National Beef as to those claims.

2. <u>Actual Agency</u>. The thrust of National Beef's argument, on the question of actual agency, is not directed at the sufficiency of the evidence to create a Jury issue, but rather, at a potential defense; namely, that Goldberger testified to the effect that Nicollet sold beef to a number of meat packing companies, of which National Beef was one. As the argument is framed by National Beef, since Nicollet was "conflicted" by selling to competing packing companies, it could not have been National Beef's agent. We find the argument to be an unconvincing feint.

Looking no further than Goldberger's deposition testimony, we find a sufficient showing to permit a Jury to determine that Nicollet was the actual agent of National Beef. According to Goldberger, McDougall, and Arthur L. Wagner ("Wagner"), who

---

[6]Our examination of the documents underlying the sales by Blom, and Jensen, to Nicollet, also fails to disclose any mention of the participation of CBP in arranging, negotiating, or effecting, those sales. See, <u>Exhibit L-1 through L-4, National Beef's Appendix of Exhibits, Docket No. 143-1</u>, at pp. 1 - 4 of 4; <u>Exhibit P-1 through P-3, National Beef's Appendix of Exhibits, Docket No. 143-5</u>, at pp. 1 - 4 of 4.

was the Vice President for Cattle Procurement for National Beef, see, <u>Deposition of Wagner, Docket No. 147-3</u>, at p. 2 of 4, authorized him to buy cattle for National Beef.  See, <u>Deposition of Goldberger, Docket No. 161-1</u>, at p. 8 of 18.  On some occasions, Goldberger would call National Beef to advise that he had cattle available for National Beef to buy or, on other occasions, National Beef would call Goldberger to advise that it was looking to buy cattle at a certain price.  <u>Id.</u>  Goldberger related that he would "carry the order" for National Beef, and he defined that terminology as follows:

> You carry their order when they're bidding, when you're bidding for them.  Yeah, they trusted me to spend their money, I guess, because they were taking the cattle live weight plus commission and freight.  And the risk was on them for the yield and the grade.  So, yeah, they trusted my company with their money.

>     *     *     *

> What I mean by carrying the order for a packer is that I had orders for them when I went to bid on the cattle.  So I would go to bid on X, Y, Z's cattle.  I either had a bid from Creekstone or I had a bid from National when I went to bid on the cattle.

> Or there were times that guys would call me and say, "I've got these thousand cattle and I want $0.90 a pound.  And I'd call the plant and say, "What do you think?  Here's

what they'll yield, here's what they'll grade."  And they'll
say, "Okay, take them, or "Go bid them back at 89."

<u>Id.</u> at 9 of 18.

By way of example, Goldberger testified as follows:

> Q. Let's just talk about a live sale.  There were times
> when National Beef would say, " I want X head of
> cattle and I'll pay you Y cents a hundredweight,"
> right?

> A. Yeah.

> Q. And then you would go out and buy the cattle and
> National Beef would be obligated to take them?

> A. Yeah.  They would take them and hopefully most of
> the time they would cost what they wanted them to
> cost to me.  Sometimes they were over the order,
> sometimes they were cheaper than the order they
> gave me.

> Q. I just want to focus on one specific example.

> A. Okay.

> Q. Isn't it -- National Beef, for example, says, "I want
> to buy X head of cattle, a thousand head of cattle,
> and I'll pay $85 per hundredweight."

> A. Okay.

> Q. All right.  Then if you found X head of cattle at the
> right price, you'd buy them and National Beef would
> be obligated to take them?

A.    Let's just take a step back.  I would -- I wouldn't buy
      them.  I would call Denny [McDougall], say, "Here's
      what I have.  Is your order still the same?"  I would
      always reconfirm the sale prior to purchasing the
      cattle, especially, for instance, if it was a thousand
      head.

Q.    Okay.

A.    Okay.  Because a thousand head can be millions of
      dollars.

Q.    Okay.

A.    So I always reconfirmed that the order was still there
      and confirmed the sale.

Id. at p. 10 of 18.

By following this approach, of always confirming the sale, Goldberger, and Nicollet,

were never taking the market risk.  Id. at p. 14 of 18.

      Goldberger also testified that he would never take physical possession of the

cattle he purchased on behalf of National Beef, id. at pp. 13-14 of 18, and Nicollet

would not send a check to the cattle producers, until it received a check from the buyer

-- i.e., National Beef.  Id. at p. 6 of 18.  National Beef bought cattle from Nicollet

"pretty much every week," and Goldberger "had their order in specific areas," and

"was allowed to buy cattle for them."  Id. at p. 8 of 18.  Moreover, National Beef

provided Nicollet with guidelines as to which types of cattle to purchase, and

subsequently, provided Nicollet with profit and loss statements reflecting how Nicollet's purchases of cattle complied with those guidelines. <u>Id.</u> at p. 12 of 18, and at p. 16 of 18. Since National Beef controlled the price at which it would authorize Nicollet to buy cattle, Nicollet took no market risk on those purchases. <u>Id.</u> at p. 12 of 18, and at p. 14 of 18. As related by Goldberger, Nicollet was not taking a market risk because "we had the cattle sold," and "our margin, our profit was the commission." <u>Id.</u> at p. 14 of 18. Goldberger testified that, when he sells cattle on a commission-only basis, as he claims he was with National Beef, he is acting as an agent of the packing plant to whom the cattle are sold. <u>Id.</u> at p. 16 of 18.

Given this evidence, alone, we are satisfied that the Plaintiffs have submitted a sufficient showing to create a Jury issue on the question of actual agency. See, e.g., <u>Valley View Cattle Company v. Iowa Beef Processors, Inc.</u>, 548 F.2d 1219, 1222-24 (5th Cir. 1977), cert. denied, 434 U.S. 855 (1977)(finding a Jury question as to agency, on facts paralleling those presented here, in the context of cattle purchases by a claimed agent of a meat packing company); <u>Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc.</u>, 630 F.2d 250, 270-71 (5th Cir. 1980)(same); <u>In the Matter of the Insurance Agents' Licenses of Kane</u>, supra at 873 (if believed, Goldberger's testimony

would establish National Beef's consent to the agency, Nicollet's actions for National Beef, and National Beef's control over those actions).

While we understand that National Beef takes exception to some of Goldberger's testimony, that disagreement underscores the need for a Jury's resolution of the conflicting facts. See, In re Prempro Products Liability Litigation, --- F.3d ---, 2009 WL 3518245 at *11 (8th Cir., November 2, 2009)("If conflicting inferences reasonably can be drawn from evidence, the jury is in the best position to determine which inference is correct."), quoting Christensen v. Titan Distrib., Inc., 481 F.3d 1085, 1092 (8th Cir. 2007)[citations and internal quotations omitted]. This is equally so with respect to the existence of an agency. See, American Prairie Const. Co. v. Hoich, 560 F.3d 780, 793 (8th Cir. 2009)("[W]hen the facts pertaining to the existence of an agency are conflicting, or conflicting inferences may be drawn from the evidence, the question is one of fact for the jury, or for the court as the trier of fact if the case is tried without a jury."), quoting 3 Am. Jur.2d Agency §352; see also, Smith v. Woodwind Homes, Inc., 605 N.W.2d 418, 424 (Minn.App. 2000)("[W]hen the evidence is conflicting, whether an agency relation exists presents a question of fact for the trier of fact."), quoting PMH Properties v. Nichols, supra at 803.

National Beef does not appear to quarrel with that general proposition, but instead, argues that, since Nicollet purchased cattle for more than one (1) meat packing company, there was a systemic conflict of interest which precluded Nicollet from acting as National Beef's agent. Given the uncontested Record before us, we agree with National Beef, that Nicollet sold to several meat packers, including O&S Cattle Company, Green Bay Dressed Beef, Peck Foods, Pine Valley Meats, Creekstone Farms, Agri Processors, BPI, IBP, Swift, Aurora Packing, and Booker Packing. See, <u>Deposition of Goldberger, Docket No. 161-1</u>, at p. 9 of 18. It escapes us, however, why that circumstance, standing on its own, should disqualify Nicollet from acting as National Beef's agent. If the rules of actual agency only applied to exclusive agents, then you would certainly find some case law to that effect, and National Beef offers no such case authority.

Rather, National Beef relies on the Court's observation, in <u>Anderson v. Anderson</u>, 197 N.W.2d 720, 724 (Minn. 1972), that "[a]n inflexible rule of law declares that an agent vested with discretionary authority cannot represent two parties having conflicting interests without the principal's prior consent or subsequent ratification after full disclosure of all the facts." We can accept that observation, since "[t]he underlying reason for the rule is the public policy to prevent fraudulent

conduct." Id., (citing cases).  In Anderson, the agent was serving one (1) principal to the economic disadvantage of other principals, and without the knowledge of those who were disadvantaged.  Moreover, in his capacity as a dual agent, he was self-dealing -- against the interests of the unknowing principals -- and he was plainly engaged in fraudulent conduct.  Whatever may be said about Anderson, it is clear that the Minnesota Supreme Court was not banning dual or multiple agencies, but it simply was assuring that such agencies were not committing fraudulent acts.

Here, there is no evidence to suggest that anything Nicollet was doing as National Beef's agent was fraudulent, and notably, National Beef makes no such claim.  Further, the Record is silent as to whether National Beef was aware that Nicollet was purchasing cattle, as the agent of other meat packing companies,[7] and we are not empowered, under Rule 56, to assume that such evidence exists, as our

---

[7]As we noted at the time of the Hearing, if National Beef's position were a correct one, then every real estate agent could only serve one seller, or one buyer, for, as National Beef posits the proposition, if the real estate agent listed numerous houses for sale, then that agent would have a systemic conflict of interest, as each seller would be in competition with every other seller listed by the same agent.  The same would be true for every agent who markets athletic or performing arts talent.  Missing from National Beef's analysis, is the requisite that the principal is unaware of the potential conflict.  Here, National Beef has denied that Nicollet was its agent, but no evidence is offered that National Beef was unaware of the fact that Nicollet was serving as an agent for other packers.

obligation is to draw all reasonable inferences in the nonmoving parties' favor -- here, the Plaintiffs. See, e.g., <u>Brown v. J.B. Hunt Transport Services, Inc.</u>, --- F.3d ---, 2009 WL 3818374 at *3 (8th Cir., November 17, 2009), citing <u>Weitz Co. v. Lloyd's of London</u>, 574 F.3d 885, 892 (8th Cir. 2009). Where, as here, the moving party fails to substantiate an element necessary to the award of Summary Judgment, Summary Judgment should be denied. See, <u>Didier v. J.C. Penney Co., Inc.</u>, 868 F.2d 276, 280 (8th Cir. 1989)("[A] party cannot be on the prevailing side of a motion for summary judgment on an issue unless it makes a sufficient showing as to those essential elements with respect to which it has the burden of proof at trial."), citing <u>Celotex Corp. v. Catrett</u>, supra at 322-23.

Moreover, National Beef appears to misapprehend the very authority it offers to support its contention. To quote National Beef:

> Under the Restatement Second of Agency, the primary test of whether an individual is an agent or a supplier is whether the individual agrees to act primarily for the benefit of the purported principal. "One who contracts to acquire property from a third person and convey it to another is the agent of the other and not for himself."

<u>National Beef's Memorandum, Docket No. 140</u>, at p. 34, quoting <u>Restatement of Agency (Second) §14K</u>.

Here, Goldberger testified, as we have detailed, that Nicollet undertook National Beef's bidding, under National Beef's direct control, and with National Beef's consent, and further, that the only profit it received from purchasing cattle on National Beef's behalf, was its commission which was paid by National Beef. If, as National Beef intimates, Nicollet was self-dealing, or committing any fraud against National Beef, then National Beef should have offered competent evidence of the same, and not simply requested the Court to engage in mere presumption.

Of course, if, as National Beef now urges, Nicollet had a conflict of interest, so as to disqualify it from serving as National Beef's agent, then National Beef will be obligated to make such a factual showing at the time of Trial, and if the showing is supported by sufficient evidence, National Beef may well be entitled to the entry of Judgment as a matter of law or, at a minimum, a Jury Instruction on the question. In the absence of such evidence, however -- and that is the circumstance before us -- National Beef is entitled to no relief as a matter of law. Accordingly, we recommend that National Beef's Motion for Summary Judgment be denied with respect to the Plaintiffs' claims that are predicated on actual agency.

NOW, THEREFORE, It is --

RECOMMENDED:

That the Motion of the Defendant National Beef Packing Company, LLC, for Summary Judgment [Docket No. 139] be granted as to the Plaintiffs' claims that are predicated upon apparent agency, but denied as to those claims that are premised upon actual authority.

Dated:  December 3, 2009                    *s/Raymond L. Erickson*
                                            Raymond L. Erickson
                                            CHIEF U.S. MAGISTRATE JUDGE

## NOTICE

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than December 17, 2009**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing by no later than **December 17, 2009**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.